# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Robert L. Bartlett,                              Civ. No. 09-3203 (PAM/JJK)

        Plaintiff,

v.

Michael J. Astrue,                              **REPORT AND RECOMMENDATION**
Commissioner of Social Security
Administration,

        Defendant.

---

Neut L. Strandemo, Esq., Standemo Sheridan & Dulas, PA, counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

        Pursuant to 42 U.S.C. § 405(g), Plaintiff Robert Bartlett seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for disability-insurance benefits and supplemental-security income. The parties have filed cross-motions for summary judgment. (Doc. Nos. 9, 11). This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Plaintiff's motion be denied, and Defendant's motion be granted.

# BACKGROUND

## I.    Procedural History

Plaintiff filed applications for disability-insurance benefits and supplemental-security income on October 25, 2006, alleging a disability-onset date of August 15, 2006.  (Tr. 107-14.)[1]  The applications were denied initially and on reconsideration.  (Tr. 40-54.)  Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on January 5, 2009.  (Tr. 4-5,18-39.)  On March 9, 2009, the ALJ issued an unfavorable decision.  (Tr. 6-17.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on September 23, 2009.  (Tr. 1-3.)  The ALJ's decision therefore became the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  On November 17, 2009, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g).  Defendant filed an Answer and the Administrative Record on January 22, 2010. (Doc. Nos. 6, 7.)  The parties thereafter filed cross-motions for summary judgment.  *See* D. Minn. Loc. R. 7.2.  Defendant filed a Supplemental Administrative Record on August 17, 2010, which included a complete copy of the transcript of the hearing before the ALJ on January 5, 2009.  (Doc. No. 15).

---

[1]     Throughout this Report and Recommendation, reference to the administrative transcript for the present case, Civ. No. 09-3203 (PAM/JJK), is made by using the abbreviation "Tr."

## II.    Factual Background and Medical History

Plaintiff was born on July 23, 1955.  (Tr. 107.)  At the time of his alleged

onset of disability, August 15, 2006, he was 51 years old.  (Tr. 15.)  Plaintiff

completed four or more years of college, and he has past relevant work as a

sales clerk at a light, semi-skilled level, and a paramedic, at a very heavy, skilled

level.  (Tr. 145, 199.)  Plaintiff alleges that he cannot work in full-time competitive

employment because his cognitive functions were impaired by a stroke, and he

has congestive heart failure and suffers depression.  (Tr. 140, 153.)

This Court notes that Plaintiff's testimony and the record strongly suggest

that Plaintiff had only one stroke.  However, some of the medical records indicate

that Plaintiff had a stroke in 1995, and some records indicate he had a stroke in

1998.  (Tr. 230, 241, 267, 272, 325, 332, 364, 426.)  For example, in a medical

record dated March 1999, Plaintiff was noted to be a second year nursing

student at the time of his stroke in 1998, and he would have received his nursing

degree in the spring of 1999.  (Tr. 325.)  In a medical record in 2008, Plaintiff was

noted to have been in his final year of a nursing program in 1995, when he had a

stroke.  (Tr. 341.)  The earliest medical record indicates that Plaintiff had a stroke

specifically on December 14, 1998.  (Tr. 325.)[2]  The hospital records from

---

[2]    Under "Background Information" of this neuropsychological report, the
evaluator states, "It should be noted that dictation of this report was extensively
delayed because records were sent for three separate times without receipt,
because of this, for example, the exact location of Mr. Bartlett's stroke is
unknown.  His having had the right-sided lesion is inferred from his pattern of
symptomatology."  (Tr. 325.)

Plaintiff's actual treatment when he had a stroke are not in the Administrative Record. The medical expert, Dr. Joseph Horozaniecki, reviewed the record and noted that Plaintiff had a stroke in 1995, but did not testify as to the records that indicated Plaintiff had a stroke in 1998. (Doc. No. 15, Supplemental Transcript ("Supp. Tr.") 485.) This Court cannot reconcile these apparent inconsistencies.

Plaintiff's medical records begin with a neuropsychological evaluation dated March 1999. (Tr. 325-29.) Dr. Stephanie Boyle referred Plaintiff for a neuropsychological evaluation three months after he had a right hemisphere stroke secondary to atrial fibrillation.[3] (Tr. 325.) The purpose of the evaluation was to determine if Plaintiff's cognitive functions were adequate for him to return to work as an emergency-room technician. (Tr. 325-29.) After the stroke, Plaintiff developed short-term memory loss, left-sided weakness, and fatigue. (Tr. 325.) The evaluator noted that Plaintiff had a degree in Business Administration, with a minor as a paramedic, and worked eighteen years at North Memorial Medical Center as a paramedic. (*Id.*) Plaintiff reported that he left his job as a paramedic due to conflict with management, and next worked as a prep cook at Byerly's until he went back to nursing school. (*Id.*) He was nearing

---

[3] Atrial fibrillation is a condition where the normal rhythmical contractions of the cardiac atria are replaced by rapid irregular twitchings of the muscular wall; the ventricles respond irregularly to the dysrhythmic bombardment from the atria. *Stedman's Medical Dictionary* 668 (27th ed. 2000) ("*Stedman's*").

completion of his degree, and was also employed by Methodist Hospital as an emergency-room technician when he had a stroke. (*Id.*)[4]

Plaintiff's overall intelligence was assessed using the WAIS-III, where he scored in the high-average range of intelligence. (Tr. 326.) There was a strong indication that Plaintiff was a better verbal problem solver than a visual problem solver. (*Id.*) Plaintiff's score on visually oriented processing tasks was also significantly below his verbal abilities. (*Id.*)

Plaintiff was also given several memory tests. (Tr. 326-27.) Plaintiff had deficits only in delayed visual memory, but even his lowest scores fell within the average to low average range, indicating no profound impairment. (Tr. 327.) Plaintiff's attention was tested using a variety of tasks, and all of his scores fell within the average to high-average range. (*Id.*)

Plaintiff's executive skills, i.e., the ability to think logically and rationally, goal-directed problem solving, and developing and maintaining mental sets, were also tested. (*Id.*) Plaintiff made an early impulsive mistake on one such test that caused him to score in the borderline range. (*Id.*) Plaintiff scored in the low-

---

[4]     This is consistent with Plaintiff's earnings statements, which indicate that Plaintiff worked for North Memorial Healthcare until 1994; Byerly's in 1995-96; and Park Nicollet Health Services from 1996-2000. (Tr. 119-20.) Park Nicollet Health Services is associated with Park Nicollet Methodist Hospital. *See* www.parknicollet.com.

average range on an executive skills test that involved visual oriented tasks requiring speed of processing.  (*Id.*)[5]

Plaintiff was also tested for depression, and scored in the minimally depressed range.  (Tr. 328.)  The evaluator characterized Plaintiff as someone who was somewhat unhappy, and appeared to have "significant cognitive sequelae of his stroke."  (*Id.*)  Nevertheless, the evaluator stated the following:

> I believe that it is likely appropriate for Mr. Bartlett to return to work, as long as his physical stamina is adequate.  This is also dependent on the job being, as Mr. Bartlett said, one in which he is assigned to do a limited set of routine, overlearned tasks.  I believe that his education may well be more difficult at this point.  Nursing is certainly a job with many changing responsibilities, where fast thinking and ability to respond quickly to new sets of information is highly important.  On the other hand, Mr. Bartlett was seen only three months post-stroke, and he is not returning to school until approximately five months after this evaluation.  He may well have improved rapidly over this time.

(*Id.*)

Plaintiff's next medical records are six years later.  On May 7, 2005, Plaintiff was admitted to Methodist Hospital after suffering abrupt left-sided facial droop and right-sided weakness.  (Tr. 368.)  This record indicates that Plaintiff had a known history of atrial fibrillation and embolic CVA ("cardiovascular

---

[5]     Page 5 of this report, which appears to contain the remainder of the four executive-skills-test results, is missing from the record, as indicated by the pagination on the top left-hand side of the report.  (Tr. 327-28.)  The parties were unable to locate a copy of the missing page to provide the Court.

accident" or "stroke") in 1998, and had recently been off his Coumadin[6] for three months for financial reasons. (Tr. 364-65.) Plaintiff's discharge diagnoses were "cardiomyopathy with congestive heart failure" and "atrial fibrillation/flutter." (*Id.*)

One month later, Plaintiff went to the Methodist Hospital emergency room after a near "syncope episode" at a restaurant. (Tr. 426-35.) Under "Past Medical History," this record indicates: (1) "Atrial fib/flutter"; (2) "History of embolic cerebrovascular accident in 1998 to the right basal ganglia region. The result, probably cognitive impairment"; (3) "Cardiomyopathy, last ejection fraction 15-20% in 5/2005, and this has also been noted since 1998"; (4) "History of alcohol abuse"; (5) "Tobacco abuse"; (6) "Hyperlipidemia"; and (7) "Depression. (Tr. 426.) The consulting cardiologist noted that Plaintiff's functional status was "relatively good," because Plaintiff exercised and biked on a regular basis without any significant limitations. (Tr. 432-33.) Thus, Plaintiff was assessed as New York Heart Association Class I-II.[7] (Tr. 434.) Plaintiff's discharge diagnoses

---

[6]     Coumadin, an anticoagulant, is indicated, among other things, to reduce the risk of death, recurrent myocardial infarction, and thromboembolic events such as stroke or systemic embolization after myocardial infarction. *Stedman's* at 1040.

[7]     The New York Heart Association Functional Classification System is a classification system developed to grade congestive heart failure by severity of symptoms. Class I indicates no limitation of physical activity and no shortness of breath, fatigue, or heart palpitations with ordinary physical activity. Class II indicates slight limitation of physical activity, and shortness of breath, fatigue or heart palpitations with ordinary physical activity, but patients are comfortable at rest. *Hickman v. Apfel*, No. Civ.A 99-2365, 2000 WL 322783, at *4 n.4 (E.D. La. Mar. 28, 2000).

were "Presyncope," "Atrial fibrillation/flutter with bradycardia,"[8] "Tobacco abuse,"

and "Elevated INR."[9]  (Tr. 426.)  Plaintiff was instructed to follow up in one or two

weeks.  (Tr. 427.)

Plaintiff saw Dr. Hongsheng Guo at Park Nicollet Clinic on August 12,

2005.  (Tr. 241.)  Dr. Guo noted Plaintiff had a history of nonischemic

cardiomyopathy,[10] intermittent atrial fibrillation, and stroke diagnosed in late

1995.  (*Id.*)  Dr. Guo reviewed Plaintiff's past echocardiograms:  (1) the May 2,

1996 exam showed an enlarged left ventricle with ejection fraction[11] 45 to 50%;

(2) the December 17, 1998 exam showed severely reduced left ventricular

function with ejection fraction less than 30%; (3) the May 10, 2005 exam showed

a left ventricular ejection fraction of 15 to 20%, with severe diffuse hypokinesis;[12]

---

[8]      Bradycardia is slowness of the heartbeat, usually defined as a rate under 50 beats per minute.  *Stedman's* at 232.

[9]      INR stands for International Normalized Ratio, a comparable rating of a patient's prothrombin time (PT) ratio, used as a standard for monitoring the effects of warfarin (*see also infra* notes 18 and 19.)  *Mosby's Medical, Nursing & Allied Health Dictionary* 855 (5th ed. 1998) ("*Mosby's*").

[10]      Myocardial ischemia is inadequate circulation of blood to the myocardium, usually as a result of coronary artery disease.  *Stedman's* at 924. Cardiomyopathy is the primary disease process of the heart muscle.  *Id.* at 290. Plaintiff has *nonischemic* cardiomyopathy.

[11]      Ejection fraction ("EF") is the proportion of blood ejected during each ventricular contraction compared with the total ventricular volume.  The EF is an index of left ventricular ("LV") function, and the normal LV fraction is 65%. *Mosby's* at 539.

[12]      Hypokinesis is diminished or slow movement.  *Stedman's* at 861.

and (4) the June 9, 2005 exam showed moderate to severe left ventricular dilatation[13] and severe diffuse hypokinesis.  (*Id.*)  Then, Dr. Guo reviewed Plaintiff's holter monitor recordings from June 13, 2005, which indicated intermittent atrial fibrillation, significant sinus bradycardia while sleeping, and nonsustained ventricular tachycardia.[14]  (*Id.*)  Plaintiff did not register any symptoms with the recordings, but complained of orthostatic lightheadedness.  (*Id.*)  Dr. Guo noted that despite his low ejection fraction, Plaintiff was physically active, having biked ten miles that day, and he assessed Plaintiff as New York Heart Association "Class I at worst."  (Tr. 242-43.)  Dr. Guo recommended ICD implant[15] for near syncope.  (Tr. 243.)

On August 25, 2005, Plaintiff was admitted to Methodist Hospital for elective ICD implant.  (Tr. 233.)  The next day, Plaintiff's discharge diagnoses were: (1) "Documented nonsustained ventricular tachycardia"; (2) "Nonischemic cardiomyopathy with ejection fraction 15% to 20%"; (3) "A history of near syncope"; (4) "Paroxsymal atrial fibrillation, on anticoagulation"; (5) "Sinus

---

[13]     Dilatation is synonymous with dilation and means physiologic or artificial enlargement of a hollow structure or opening.  *Stedman's* at 502.

[14]     Tachycardia means rapid beating of the heart, conventionally applied to rates over 90 beats per minute.  *Stedman's* at 1782.

[15]     An implantable cardioverter defibrillator ("ICD") is an implantable device that detects sustained ventricular tachycardia or fibrillation and terminates it by a shock or shocks delivered to the myocardium, thus, preventing sudden cardiac death.  *Miller-Keane Encyclopedia & Dictionary of Medicine, Nursing & Allied Health* 472 (Saunders 7th ed. 2003) ("*Miller-Keane Encycl. & Dictionary*").

bradycardia"; (6) "Congestive heart failure with New York Heart Association Function Class I"; (7) "History of a stroke"; (8) "Status post sepsis for a dual-chamber implantable cardioverter defibrillator implant." (*Id.*)

Plaintiff was next admitted to Methodist Hospital on September 4, 2005, after receiving four shocks from his defibrillator while he was out biking. (Tr. 230.) Dr. Jeffrey Schultz noted at that time that Plaintiff had a history of nonischemic dilated cardiomyopathy, with an ejection fraction of 15% as of May 2005, and a history of cerebrovascular accident in 1998, with residual cognitive impairment. (*Id.*) Plaintiff underwent beta-blocker loading, and his defibrillator was reprogrammed. (Tr. 231.)

Plaintiff followed up with Dr. Guo on September 7, 2005. Dr. Guo interrogated Plaintiff's ICD and discovered several episodes of supraventricular tachycardia ("SVT") but no ICD shocks. (*Id.*) Dr. Guo recommended ablation[16] of the atrial fibrillation to try to decrease inappropriate shock for SVT. (Tr. 227-28.)

On January 6, 2006, Plaintiff saw Dr. Guo in follow up for the atrial fibrillation ablation that was performed on December 9, 2005. (Tr. 215.) Plaintiff reported that he felt great, with no evidence of recurrence of atrial fibrillation, and that he planned to bike to work that day. (*Id.*) Plaintiff reported that he had no

---

[16]     Ablation is the removal of a body part or destruction of its function, as by surgical procedure. For example, electrode catheter ablation is a method of ablating the site of origin of arrhythmias whereby high-energy electrical current is delivered by intravascular catheters. *Stedman's* at 3.

symptoms of dyspnea on exertion, orthopnea,[17] chest pain, lightheadedness, dizziness, or syncopal episodes.  (*Id.*)  Dr. Guo performed a device interrogation that revealed many episodes of atrial fibrillation with mode switches.  (Tr. 216.)  Dr. Guo also noted that Plaintiff had trouble remembering to take his Coumadin, and stressed the importance of it to him, especially because of his past history of stroke.  (Tr. 215-16.)

On February 3, 2006, Dr. George Strauss at Park Nicollet Clinic reviewed Plaintiff's electrophysiology report.  (Tr. 213.)  He noted that Plaintiff's pacemaker revealed 19 hours of atrial fibrillation and ordered a repeat echocardiogram.  (*Id.*)

Plaintiff went to Park Nicollet Clinic on February 8, 2006, for an annual exam.  (Tr. 209.)  Dr. Peterson noted that Plaintiff was on Coumadin, and reported feeling well overall.  (*Id.*)  Under a section of his report entitled "Social History," Dr. Peterson noted that Plaintiff was "divorced from his wife due to significant personality changes after his stroke," and that Plaintiff had two adult children.  (Tr. 209-10.)  Dr. Peterson also noted that Plaintiff had recently stopped smoking, and he rode his bike to work when the weather permitted.  (Tr. 210.)  Plaintiff's examination was essentially normal.  (*Id.*)

Plaintiff had an echocardiogram ("ECG") on February 9, 2006.  (Tr. 238-39.)  Dr. Maria Soper's conclusions from the ECG were that: (1) the left ventricular ejection fraction is 50%, indicating "[l]ower limits of normal to mildly

---

[17]     Orthopnea is discomfort in breathing that is brought on or aggravated by lying flat.  *Stedman's* at 1277-78.

decreased"; (2) all four valves are normal; (3) "[c]ompared with the report of June 2005, severe diffuse hypokinesis was present and left ventricular chamber size was 6.5." (Tr. 238.)

On December 1, 2006, Plaintiff underwent a consultative psychological examination with Dr. Alford Karayusuf. (Tr. 267-69.) Plaintiff complained that he gets distracted, bored, and can not stay on task. (Tr. 267.) He said his life changed around the year 1995, after he had congestive heart failure and a stroke. (*Id.*) Plaintiff reported a history of alcohol abuse, beginning at age eighteen, and that he underwent chemical dependency treatment in 2001 and 2003. (*Id.*) He stated that he had been sober since 2003. (*Id.*) Plaintiff reported that he had recurring suicidal thoughts, difficulty sleeping, decreased appetite, and poor concentration and memory. (Tr. 268.) Plaintiff believed his memory deteriorated after his stroke. (*Id.*) At the time of the evaluation, Plaintiff had a job stocking shelves eight hours a week. (*Id.*)

Plaintiff described his daily functioning as getting up around 5:30 a.m., preparing his own meals or eating fast food, grocery shopping once a month, washing dishes daily, and doing laundry every other week. (*Id.*) He stated that he went to church once a week but did not remember anything that was said. (*Id.*) He had no friends, and reported that his two adult sons wanted nothing to do with him. (*Id.*)

On mental-status examination, Plaintiff's recent and remote memory was intact. (*Id.*) Plaintiff related in a slightly subdued, polite, and friendly manner.

(*Id.*)  He was cooperative, with mild tension.  (*Id.*)  His speech was coherent and relevant, but he appeared mildly depressed.  (*Id.*)  Dr. Karayusuf diagnosed depression NOS and opined that Plaintiff could understand, retain, and follow simple instructions, interact appropriately with others, and maintain persistence and pace.  (Tr. 269.)

On December 6, 2006, Plaintiff underwent a physical consultative examination with Dr. Azam Ansari, who reviewed Plaintiff's available medical records.  (Tr. 272-74.)  Under the "History" section of his report, Dr. Ansari noted:

> [Plaintiff] has not been able to engage in any substantial gainful activity because of non-ischemic cardiomyopathy and embolic cerebrovascular accident causing left-sided hemiparesis in 1995. He underwent aggressive rehabilitation and recovered most of his strength lost.  However, cognitive function has declined and forgetfulness has increased.  He has made several mistakes on the job when he was working as a customer service representative. Even now, when he is working as a part-time stocker, he has not been able to do his job properly.

(Tr. 272.)  At the time of the exam, Plaintiff denied many symptoms, including chest discomfort, shortness of breath, fainting, tremor and memory loss. (Tr. 272-73.)  Ultimately, Plaintiff's examination was normal and Dr. Ansari noted that Plaintiff had "high intellectual functions."  (Tr. 273-74.)  Dr. Ansari diagnosed the following:  (1) "Non-ischemic cardiomyopathy without congestive heart failure"; (2) "Implantable cardioverter-defibrillator for low ejection fraction (6/2005)"; (3) "Status post ablation for atrial fibrillation"; (4) "Status post cerebral

embolism"; (5) "Declining cognitive function since cerebral embolism"; and (6) "Hypoprothrombinemia[18] due to warfarin."[19]  (Tr. 274.)

On December 18, 2006, state agency consultant Dr. B.R. Horton reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form ("PRTF") regarding Plaintiff.  (Tr. 276-89.)  He indicated that Plaintiff's mental impairments fell under listings 12.04 and 12.09, affective disorders and substance addiction disorders.  (Tr. 276.)  Under the B criteria of the Listings,[20] he found that Plaintiff had no more than mild functional limitations, and no episodes of decompensation.  (Tr. 286.)

On January 12, 2007, Dr. Charles T. Grant, also a state agency consultant, completed a Physical Residual Functional Capacity Assessment regarding Plaintiff based on his review of Plaintiff's records.  (Tr. 293-300.)  He opined that Plaintiff could lift and carry twenty pounds occasionally, and ten pounds frequently.  (Tr. 294.)  He also opined that Plaintiff could stand, walk, and sit,

---

[18]     Hypoprothrombinemia refers to abnormally small amounts of prothrombin in the circulating blood.  *Stedman's* at 863.  Prothrombin is a glycoprotein, a deficiency of which leads to impaired blood coagulation.  *Stedman's* at 1465.

[19]     Warfarin is the generic name for Coumadin.  *Physician's Desk Reference* ("*PDR*") 1039 (Thomson PDR 59th ed. 2005).

[20]     The Paragraph B criteria of the mental impairment listings are a set of impairment-related functional limitations.  *See* 20 C.F.R. § 404, Subpart P, Appendix 1, Section 12.00.  To meet the Paragraph B criteria for Listings 12.04 or 12.09, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  *See* 20 C.F.R. § 404, Subpart P, Appendix 1, Sections 12.04, 12.09.

each for six hours in an eight hour workday.  (*Id.*)  He opined that Plaintiff would have no other functional restrictions.  (Tr. 294-97.)

Dr. David Biscardi, another state agency consultant, reviewed Plaintiff's records in the Social Security file as of March 29, 2007, and completed PRTF and Mental Residual Functional Capacity Forms regarding Plaintiff.  (Tr. 301-11, 312-15.)  He opined that Plaintiff had mental impairments under Listings 12.04 and 12.09, affective disorders and substance addiction disorders.  (Tr. 301.) Under the B criteria of the listings, he opined that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence and pace, and no episodes of decompensation.  (Tr. 309.)

On the Mental Residual Functional Capacity Form, Dr. Biscardi rated Plaintiff as moderately limited in the following activities: understand and remember detailed instructions; carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting.  (Tr. 312-13.)  Dr. Biscardi found no other significant limitations.  He opined that Plaintiff had "the capacity to understand, remember, carry out and sustain performance of simple routine tasks, complete a normal workday, interact with others and adapt to

changes/stressors associated with simple routine competitive work activities."
(Tr. 314.)

On December 27, 2007, Plaintiff underwent a self-referred psychological evaluation with Dr. Julia Lofness. (Tr. 332-34.) Plaintiff reported that he had recently been laid off his part-time stockroom job when the store announced plans to close. (Tr. 332.) Plaintiff described his life as a nightmare after he had a stroke in 1995. (*Id.*) He stated that after his stroke, his wife said he had changed, and she divorced him. (*Id.*) He also reported that he had difficulty keeping a job after his stroke, with most jobs lasting about a year, and that he was unhappy with his post-stroke work history, referring to his work as "schlepp jobs." (*Id.*) Plaintiff described his mood as despondent, and said he was irritable, with low energy, had sleep difficulty, and problems with attention, memory, and concentration. (*Id.*) He no longer found pleasure in anything, whereas, he used to fly an airplane and sail. (*Id.*) Plaintiff reported that he went out for a few cocktails every other week or so. (*Id.*) Socially, he occasionally spoke to his ex-wife, and he said one of his two adult sons was "kinda" in his life. (Tr. 333.)

On mental-status examination, Plaintiff was open and comfortable. (*Id.*) His speech, associations, and language were within normal limits. (*Id.*) His thoughts were logical and goal directed. (*Id.*) His recent and remote memory, attention, and concentration appeared satisfactory. (*Id.*) His intelligence was estimated to be average. (*Id.*) Plaintiff, however, reported episodes of

depressed mood and irritability. (*Id.*) Dr. Lofness diagnosed Plaintiff with "311 Depressive Disorder NOS vs. 296 Major Depressive Disorder," and assessed a GAF score of 55.[21] (*Id.*)

Plaintiff began therapy with Dr. Lofness in March 2008. (Tr. 359.) At that time, he completed a psychological test, and the results indicated severe depression. (*Id.*) Plaintiff acknowledged having suicidal thoughts nearly every day, and said he would take an antidepressant, but he could not afford it. (*Id.*) He reported that he was unemployed and not receiving benefits because he was fired for violating company policy by allowing someone to use his employee discount. (*Id.*) He was spending his time looking for a job and using the resources at a library. (*Id.*) Dr. Lofness diagnosed Plaintiff with major depressive disorder, single episode, severe. (*Id.*) She noted, "[h]e has enough insight to ask if he may be contributing to difficulty by sabotaging himself somehow." (*Id.*)

At his next session on March 21, 2008, Plaintiff reported that he was disappointed about losing out on a job offer due to an old DUI. (Tr. 358.) Plaintiff described his ideal job characteristics as part-time, physical work, nonrepetitive, very structured, and fun. (*Id.*) Dr. Lofness noted, "[Plaintiff] does take

---

[21]     "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("*DSM-IV-TR*")). A GAF score of 51-60 indicates moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 32.

responsibility for himself and knows that CVA [cerebrovascular accident] is not excuse." (*Id.*)

In therapy several weeks later, Plaintiff appeared eager about an upcoming job interview. (Tr. 357.) Apart from that, he felt very alone, and that he had nothing. (*Id.*) Dr. Lofness noted that Plaintiff was back on his medications again and was doing better. (*Id.*) She further noted that Plaintiff relied on his sister to pay his rent, and his brother and ex-wife appeared to be his only support network. (*Id.*) She also noted that Plaintiff was hurt by his sons' rejection. (*Id.*)

On April 11, 2008, Plaintiff saw Dr. Peiyi Wang at Allina Medical Clinic in follow up. (Tr. 355.) Dr. Wang noted that Plaintiff had lost his insurance and was off his medications until recently. (*Id.*) Plaintiff denied neurological symptoms. (*Id.*) However, he indicated that on more than half the days he had the following symptoms: trouble falling asleep, staying asleep, or sleeping too much; feeling tired or having little energy; having poor appetite or overeating; feeling bad about himself; and nearly every day he had trouble concentrating. (*Id.*) Dr. Wang diagnosed major depression, severe, and recommended Wellbutrin for depression and smoking cessation. (Tr. 356.)

Dr. Lofness referred Plaintiff to Dr. Michael Sethna for a cognitive evaluation, which took place on April 23, 2008. (Tr. 341-42.) Dr. Sethna noted that Plaintiff filled out a multi-system review, which indicated that he had trouble with concentration, anxiety, depression, palpitations, and poor sleep. (Tr. 341.)

On examination, Plaintiff was alert and cooperative, but had somewhat of an odd affect that Dr. Sethna associated with the right hemisphere of the brain and the inability to perceive the emotional content of speech.  (*Id.*)  On mental-status examination, all of the following were within normal limits: attention, concentration, orientation, recent and remote memory, language, affect, and fund of information.  (Tr. 342.)  Neurological testing was essentially normal.  (*Id.*)  Dr. Sethna recommended an occupational assessment.  (*Id.*)

Plaintiff saw Dr. Lofness again on June 2, 2008, and reported increased irritability and difficulty letting things go.  (Tr. 354.)  He also reported that he continued to interview for part-time jobs.  (*Id.*)  Dr. Lofness noted that although Plaintiff's mood was better, he was irritable and asocial.  (*Id.*)  Two weeks later, Plaintiff continued to look for work.  (Tr. 353.)  Dr. Lofness noted the sun and longer days played a significant role in Plaintiff's improved mood.  (*Id.*)  His improvement continued into mid-July, but his inability to find a job was getting him down.  (Tr. 350-52.)  On July 10, 2008, Dr. Lofness noted, "Pt. mood continued improved.  He remains irritable and largely stays to himself.  Cannot concentrate or sustain attention.  Occupational and social impairments.  Pt. is unable to work FT."  (Tr. 351.)  On July 24, 2008, Dr. Lofness noted there was a suggestion of avoidant personality traits.[22]  (Tr. 350.)  Several weeks later,

---

[22]    Avoidant personality disorder is generally described as a pervasive pattern of social inhibition, feelings of inadequacy, and hypersensitivity to negative evaluation beginning by early adulthood and present in a variety of contexts. *DSM-IV-TR* at 664.

Plaintiff reported being more depressed, demoralized, and irritable because his bike was stolen, and it had been his primary mode of transportation. (Tr. 349.) At the end of August, Plaintiff continued to be irritable, partly due to his unsuccessful job search. (Tr. 348.) However, when Plaintiff went to therapy on September 8, he reported that his self esteem was back because he was offered a job. (Tr. 347.)

On August 18, 2008, Plaintiff underwent a neuropsychological evaluation at Noran Neurological Clinic with Dr. Gregory Lamberty. (Tr. 336-40.) In the clinical interview, Plaintiff reported that he was fired from his job as a paramedic, which he held from 1977 through 1995. (Tr. 336.) Plaintiff also reported that after his stroke, his marriage ended, and he began drinking, getting three DUIs in the years 1995, 2000, and 2001. (*Id.*) He then went through treatment and became sober. (*Id.*) Subsequent to his stroke, Plaintiff had jobs as a telemarketer, a pharmacy technician, and as a health-unit coordinator at Methodist Hospital. (*Id.*) His most recent job was working in a stockroom, which lasted about a year. (*Id.*)

Plaintiff was pleasant and cooperative during evaluation, but showed significant "disinhibition."[23] (Tr. 337.) Dr. Lamberty noted that Plaintiff put forth a

---

[23] Disinhibition, as a term used in psychology, is a process that results in an individual having a reduced capacity to edit or manage their immediate impulsive response to a situation. Disinhibition is a common symptom following a physical injury to the brain, particularly to the frontal lobe. http://dictionary-psychology.com/index.php?a=term&d=Dictionary+of+psychology&t=Disinhibition (last visited October 1, 2010).

strong effort, and the test results appeared to be valid.  (*Id.*)  In the aggregate,

Plaintiff scored in the average range on intelligence testing, with a discrepancy

on verbal and visual tasks, favoring verbal tasks.  (*Id.*)  Dr. Lamberty noted that

this appeared to be the result of Plaintiff's stroke.  (*Id.*)  Plaintiff showed basic

attention and concentration abilities that were within the acceptable range, but

struggled with a range of tasks involving cognitive speed and efficiency, with

performance mildly to moderately impaired.  (Tr. 337-38.)  Overall, Plaintiff

performed in the mildly-impaired to average range on tasks involving learning

and memory.  (Tr. 338.)

At this time Plaintiff was also given the MMPI-2 personality test.  (*Id.*)  His

test results suggested a very high level of general neuropsychiatric distress.  (*Id.*)

Plaintiff reported very limited coping skills.  (*Id.*)  The test results indicated

feelings of alienation with unusual symptomatology, high levels of depression,

anxiety symptoms, overt anger, and limited psychological insight.  (*Id.*)  Plaintiff's

profile was of someone with pervasive and continuous distress.  (*Id.*)  These type

of test results typically indicated longstanding or underlying personality issues,

but Dr. Lamberty opined there was likely a "high level of symptom

acknowledgment that [did not] necessarily correspond to a specific diagnosis."

(Tr. 338-39.)  Dr. Lamberty summarized the MMPI-2 profile as suggestive of "a

high level of demoralization and general symptom acknowledgment."  (Tr. 339.)

He opined this was indicative of Plaintiff feeling overwhelmed from an emotional

standpoint, as opposed to an actual neuropsychiatric diagnosis.  (*Id.*)  He also

noted this appeared to be Plaintiff's baseline condition.  (*Id.*)  Dr. Lamberty

opined that all of his findings on Plaintiff's neuropsychological evaluation were

consistent with "sequelae of a right hemisphere stroke."  (Tr. 339.)

### III.  Testimony at the Administrative Hearing

### Plaintiff's Testimony

At the hearing, Plaintiff testified that he lives alone in an apartment, and

that he gets up in the morning and goes to the library to use the Internet to look

for jobs.  (Tr. 21-23.)  He recently worked part-time as a sales associate for the

holiday season.  (Tr. 23-24.)  When Plaintiff was not working part-time or looking

for a job, he likes to read.  (Tr. 24.)  But he has too short of an attention span to

go to a movie.  (Tr. 24-25.)  Plaintiff also stated that he does not like to be in

crowds.  (Tr. 26.)  When asked why he can not work a full-time job, Plaintiff

testified:

> I have tried before and nothing ever works out.  You know, I'll work
> for a little bit and then there will be some performance issues and I
> usually get fired or let go or they -- basically I just get fired from the
> jobs.  And I have tried since my stroke.  The last thing I ever wanted
> was to try to get on disability.  I have fought this and I have now
> come to the realization that, you know, I can't do it on my own
> anymore.

(Tr. 25.)

Plaintiff testified that he also gets fatigued and has head rushes.  (Tr. 26-

27.)  He described the head rushes as getting lightheaded and dizzy, and having

to sit down.  (Tr. 27.)  Plaintiff stated that he has these head rushes as often as

four or five times an hour.  (Tr. 31.)  He testified that some of his medications

might contribute to his fatigue and dizzy spells, and that he does not sleep well at night. (Tr. 28-29.) After going through alcohol treatment, Plaintiff drinks very little, and does not drive at all. (Tr. 29.) Plaintiff testified that his mental functioning has been declining over the last few years. (Supp. Tr. 482.)

### Medical Expert Testimony

Dr. Joseph Horozaniecki testified as a medical expert at the hearing. (Tr. 31-32.) Dr. Horozaniecki listed Plaintiff's physical impairments as "cardiomyopathy with reduced ejection fraction," "New York Heart Association Class I with chronic congestive heart failure," "status post atrial fibrillation node ablation for an arrhythmia," "status post pacemaker and defibrillator placement for ventricular arrhythmias," and "status post symbolic stroke[,] which occurred in 1995." (Supp. Tr. 484-85.) The ALJ asked Dr. Horozaniecki whether any of Plaintiff's impairments met or equaled any listing at any time. (Tr. 32.) Dr. Horozaniecki testified:

> No, Your Honor, the . . . cardiomyopathy and the arrhythmias, it's not clear from the medical record that they -- that this condition lasted -- that is to say, the impairments from this condition, the severity of them, lasted 12 months, continually for 12 months. Also, you know the listings call for . . . a severity of difficulty with activities of daily living and the medical record doesn't support that.

(Tr. 32.) In response to questioning by Plaintiff's counsel, Dr. Horozaniecki explained that Plaintiff's symptoms, which lasted generally from May 2005 through December 2005, improved very significantly after that, in response to two procedures that were done. (Tr. 33.) Dr. Horozaniecki then acknowledged that

he did not find evidence in the record that Plaintiff's ejection fraction was permanently improved, but he also said Plaintiff's activities of daily living ("ADLs") "were not impaired nearly to the extent called for by the listings."  (Tr. 33.)

Dr. Horozaniecki also testified as to Plaintiff's functional impairments.  He stated, "considering the persistence of the cardiomyopathy and the reduced ejection fraction, I'd place a sedentary level of exertion and I'd add further he would not be able to work from any heights or exposure to hazardous machinery, certainly no climbing and no exposure to excess levels of heat or humidity." (Tr. 32-33.)  Dr. Horozaniecki also testified that the head rushes Plaintiff described having were consistent with his physical condition.  (Tr. 34.)

**Vocational Expert Testimony**

Mitchell Norman testified at the administrative hearing as a vocational expert.  (Tr. 35.)  The ALJ asked Norman a hypothetical question regarding whether a man of Plaintiff's age, education, and work background who was:

> on a number of medications, the only apparent side effect being some dizziness and fatigue, who is impaired with cardiomyopathy, status post CVA and pacemaker and defib implants, who also suffers from depression and a history of alcohol abuse and I'm subsuming the cognitive disorders under the depression.  Said individual is limited to lifting and carrying 10 pounds occasionally, 5 pounds frequently, can do all the functional aspects of sedentary work; however, the individual would be limited to work where there'd be no heights, ladders, or scaffolding, dangerous or hazardous equipment or machinery, or extremes in temperature or humidity, who could do unskilled to semi-skilled work, having only brief and superficial contact with others.  Could such a person do any of the work the claimant's previously done?

(Tr. 35.)  Norman testified that such a person could not perform any of Plaintiff's past relevant work, but could perform jobs such as telemarketer, of which there are 4,200 such jobs in Minnesota, and order clerk, of which there are 6,500 such jobs in Minnesota.  (Tr. 36.)

For a second hypothetical question, the ALJ asked whether a similar individual who, due to fatigue and an inability to maintain persistence and pace, would be absent from the workplace more than two days a month could perform any jobs in the national economy.  (*Id.*)  Norman testified that such a person would be unemployable.  (*Id.*)  In response to questioning by Plaintiff's counsel, Norman testified that if a person could not be consistently engaged in whatever task he was doing at work, such a person could not "do" his or her work.  (Tr. 37-38.)

## IV.    The ALJ's Findings and Decision

On March 9, 2009, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social Security Act from August 15, 2006, through the date of the decision, therefore denying Plaintiff's applications for disability-insurance benefits and supplemental-security income.  (Tr. 6-17.)  The ALJ followed the five-step procedure as set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's

physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 15, 2006, therefore meeting the requirement at the first step of the disability-determination procedure. (Tr. 11.) At step two, the ALJ found that Plaintiff had the following severe impairments: "a history of cardiomyopathy and cardiac dysrhythmias, status post pacemaker placement and ablation; status post cerebral vascular accident; depression; and history of alcohol abuse." (*Id.*)

At step three, the ALJ found that neither Plaintiff's physical nor mental impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12.) Specifically, the ALJ concluded that Plaintiff did not meet the "paragraph B" criteria for Listings 12.04 and 12.09 because Plaintiff's mental impairments did not result in at least two "marked limitations or one 'marked' limitation and 'repeated' episodes of

decompensation." (*Id.*)  The ALJ found that Plaintiff's mental impairments resulted in only mild restrictions in his activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence or pace; and no episodes of decompensation.  (*Id.*)

The ALJ determined that Plaintiff had the RFC to perform "sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except involving no work around heights, ladders, scaffolds, dangerous/hazardous machinery, or extremes of temperature and/or humidity; and work which is unskilled to semiskilled involving brief and superficial contact with others." (Tr. 13.)  In reaching this RFC determination, the ALJ considered Plaintiff's subjective complaints, but found that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.*)  At step four of the disability determination procedure, the ALJ found that Plaintiff could not perform any past relevant work.  (Tr. 15.)  However, at the fifth step of the procedure, the ALJ found that there are jobs as a telemarketer or order clerk that exist in significant numbers in the national economy that Plaintiff would be able to perform.  (Tr. 16.)

## DISCUSSION

## I.      Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckely v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis.  *Gavin*, 811 F.2d at 1199.  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for

evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability-insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second, that other

work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 858, 857 (8th Cir. 2000).

## II.     Analysis of the ALJ's Decision

Plaintiff asserts three errors in the ALJ's evaluation of his disability claim. First, Plaintiff contends he met or equaled Listing 4.02. Plaintiff asserts that his ejection fractions, which are the proportion of blood ejected during each ventricular contraction compared with the total ventricular volume, were consistently measured at 15-20%, and ejection fractions of 30% or less during a period of stability meet Listing 4.02. Plaintiff points out that the medical expert admitted Plaintiff's ejection fractions were severely low and that there was no proof that they were permanently improved.

Second, Plaintiff contends the ALJ erred by not accepting the treating physicians' opinions, citing records from Drs. Ansari, Lamberty, and Sethna. Plaintiff asserts that the record as a whole supports the treating physicians' opinions because there is no medical testimony in the record rebutting Dr. Lamberty's opinion that cognitive dysfunction would disqualify Plaintiff from employment. Plaintiff also asserts that the record supports a finding that Plaintiff cannot work due to mental dysfunction, cardiomyopathy, fatigue, dizziness, poor concentration, and inability to be engaged in any task. Plaintiff notes that the vocational expert testified that a person who cannot remain engaged in any task is unemployable. Third, in his Reply, Plaintiff challenges the ALJ's citation to his work record in finding his subjective complaints not credible.

Defendant, on the other hand, asserts that the ALJ's RFC finding is consistent with Dr. Horozaniecki's opinion on Plaintiff's physical functional limitations and Dr. Biscardi's opinion on Plaintiff's mental limitations, and there are no contrary RFC opinions in the record. As to Dr. Lamberty's opinion, Defendant contends that Plaintiff takes a statement out of context. Defendant asserts that what Dr. Lamberty meant about Plaintiff being unable to remain engaged in tasks was that Plaintiff had the cognitive function to work, but Dr. Lamberty questioned whether Plaintiff's depression prevented work. Defendant contends the record as a whole indicates that Plaintiff's depression was not severe enough to prohibit full-time employment.

In Reply, Plaintiff asserts that the ALJ never consulted the "POMS guidelines" to determine whether Plaintiff equaled a listing. Plaintiff again noted that the medical expert could not point to a record indicating that Plaintiff's ejection fractions permanently improved after his ablation procedure. Plaintiff also asserts his cardiovascular impairments cause pain, fatigue, and dizziness, which prevent him from working consistently. And again, Plaintiff asserts there is no evidence rebutting Dr. Lamberty's opinion. This Court addresses these arguments below.

### A.  Whether Plaintiff Met or Equaled Listing 4.02

Listing 4.02 states the following, and is met under the following conditions:

Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of

severity for this impairment is met when the requirements in *both* A and B are satisfied.

A.  Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1(a)(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

2.  Diastolic failure (see 4.00D1(a)(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

AND

B.  Resulting in one of the following:

1.  Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC [medical consultant], preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2.  Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)), from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3.  Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a.  Dyspnea, fatigue, palpitations, or chest discomfort; or

b.  Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular

ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. 404, Subpart P, Appendix 1, Section 4.02 (emphasis added).

Plaintiff bases his claim of meeting or equaling Listing 4.02 on his low ejection fractions, therefore, he must prove that he meets the criteria for 4.02(A)(1) and one of the subsections under 4.02(B). *See Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (stating that claimant bears the burden of establishing a listing level impairment); *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (stating that to meet or equal a listing, all of the requirements of the listing must be met). First, the relevant time period is Plaintiff's alleged onset date, August 15, 2006 through the date of the ALJ's decision, and there are no measurements of Plaintiff's ejection fraction in the record that were taken during this time period. The most recent echocardiogram in the record was done on February 9, 2006, after Plaintiff's ablation procedure, and his ejection fraction was 50%, well above the listing level. (Tr. 238.) Plaintiff's lower ejection fractions were before the ablation procedure, and before his alleged onset date.

Second, Plaintiff has not shown that he has met any of the subsections under 4.02, paragraph B, and the Court can find no evidence in the record that supports that he meets any of these subsections. Additionally, the medical expert specifically testified that Plaintiff did not meet the criteria regarding the severity of activities of daily living [4.02(B)(1)]. (Tr. 32.)

Finally, the ALJ is not required to consult the POMS Guidelines to determine if Plaintiff equals a Listing. *See Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (stating that POMS Guidelines have no legal force and are not binding on the Commissioner). "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *Carlson v. Astrue*, 604 F.3d 589, 594 (8th Cir. 2010) (quoting *Sullivan v. Zebley*, 493 U.S. 521 (1990)). As noted above, Plaintiff only asserts that his ejection fraction was low enough to meet the criteria of paragraph A of the listing, he does not point to any evidence to establish any of the paragraph-B criteria. The medical expert's testimony that Plaintiff did not meet or equal any listed impairment is substantial evidence supporting the ALJ's determination. *See* Social Security Ruling 96-6p, 61 Fed. Reg. 34,466, 1996 WL 374180 (July 2, 1996) ("[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.") Further, the ALJ's determination is also supported by evidence that

after Plaintiff had a cardioverter-defibrillator implanted in August 2005, he was diagnosed with congestive heart failure New York Heart Association Function Class I, which indicates no symptoms with ordinary physical activity and no limitation of physical activity.  (Tr. 233); s*ee supra* n.7.  This is inconsistent with the paragraph-B criteria of Listing 4.02.

### B. Evaluating the Physicians' Opinions

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)).  A treating source is a physician, psychologist or other acceptable medical source who has an "ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.  If the physician, psychologist, or other acceptable medical source has examined you but does not have an ongoing relationship with you, he or she is a non-treating source.  *Id.* More weight is generally given to the opinion of a source who has examined the claimant over a source who has not.  20 C.F.R. § 1527(d)(1).  In weighing the opinion evidence, the following factors are considered: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) supportability of the opinion with relevant evidence; (4) consistency with the record as a whole; (5) specialization of the source; and (6) any other factors which support or contradict the opinion.  20 C.F.R.

§ 1527(d)(1-6). In this case, the ALJ adopted the medical expert's opinion of Plaintiff's physical residual functional capacity, and a state agency consultant's opinion of Plaintiff's mental residual functional capacity.

Plaintiff contends Dr. Gregory Lamberty opined that Plaintiff is unable to work in full-time employment. Dr. Lamberty performed a neuropsychological evaluation of Plaintiff at Noran Neurological Clinic on August 8, 2008. The Court notes that this is the only treatment record by Dr. Lamberty, thus, he was not Plaintiff's treating physician.[24] Dr. Lamberty made a number of comments about Plaintiff, which Plaintiff interprets as an opinion that he cannot work due to cognitive impairment. Dr. Lamberty's statements about Plaintiff's employability are best understood in the broader context of Dr. Lamberty's analysis:

> The patient clearly shows indications of cognitive dysfunction secondary to his history of right hemisphere cerebrovascular accident. Further, his occupational history is characterized with struggles maintaining competitive employment since that time. The patient has struggled with a good deal of neuropsychiatric symptomatology and it seems likely this also emerged since the time of the patient's stroke. Generally speaking, Mr. Bartlett is unlikely to experience much change in terms of his ability to perform consistently and adequately in a range of employment settings. While he worked previously at a very high level (paramedic), most of his attempts at securing appropriate employment since his stroke have been challenging, to say the least. It seems clear that the patient is not likely to be able to perform adequately in most health-

---

[24] "Treating source means your own physician, psychologist or other acceptable medical source who provides you with medical treatment . . . and who has . . . an ongoing treatment relationship with you. Generally we will consider that you have an ongoing treatment relationship . . . when the medical evidence establishes that you see . . . the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." 20 C.F.R. § 404.1502.

care settings given the complexity of such jobs.  In other words, he is not employable in a professional capacity that was his baseline before the stroke.  Whether or not the patient is able to do more menial kinds of jobs is more a function of the patient's basic level of adjustment in neuropsychiatric distress.  The nature of the tasks involved in doing the kind of work that he has more recently (stockroom) is not the problem so much as his ability to consistently be engaged and appropriate in those settings.  It does not appear, given the patient's history that this is a reasonable expectation.  Finally, the patient's difficulties are likely static not subject to improvement with any particular kind of cognitive or occupational therapy.

(Tr. 339.)

Plaintiff cites several medical records in support of his argument that the ALJ erred by not granting more weight to Dr. Lamberty's opinion.  First, Plaintiff cites the following from Dr. Azam Ansari's evaluation of Plaintiff on December 8, 2006: "Even when he is working as a part-time stocker, he is not able to do the job properly."  (Tr. 272.)  However, this statement was made in the "History" section of Dr. Ansari's consultative psychological evaluation, and was clearly Plaintiff's statement of why he was applying for disability, as opposed to Dr. Ansari's conclusion from his clinical observations.  (*Id.*)

Similarly, Plaintiff cites Dr. Michael Sethna's treatment record, which states that "[Plaintiff] has trouble with concentration, trouble with anxiety, depression, palpitations, and trouble with sleep.  A detailed multi-system review is otherwise notable for cognitive concerns and his capacity to concentrate, attend, and recall."  (Tr. 341).  Dr. Sethna's preceding sentence, "[Plaintiff] has filled out a detailed multi-system review," makes clear that these are Plaintiff's assertions,

not Dr. Sethna's conclusions based on his evaluation. On examination, Dr. Sethna found Plaintiff's "mentation," including attention, concentration, orientation, recent and remote memory, language, affect and fund of information, to be within normal limits. (Tr. 342.) This is contrary to Plaintiff's interpretation of Dr. Lamberty's opinion.

Plaintiff also contends that there is no evidence in the record rebutting Dr. Lamberty's opinion. This is incorrect because the ALJ adopted the mental RFC opinion of state agency consultant Dr. D.L. Biscardi. (*See* Tr. 15 (citing Exhibit 10F (Mental RFC Assessment dated 3/29/2007, from D.L. Biscardi); Tr. 312-14). Dr. Biscardi opined that Plaintiff could perform work limited to understanding, remembering, carrying out and sustaining performance of simple routine tasks, and interacting with others and adapting to changes/stressors associated with simple, routine, competitive, work activities. (Tr. 314.)

Whether the ALJ should have given Dr. Lamberty's opinion more weight than Dr. Biscardi's opinion depends on how one interprets Dr. Lamberty's somewhat convoluted statements. Presumably, the ALJ did not recognize Dr. Lamberty's statements as an opinion of Plaintiff's mental RFC because the ALJ did not address Dr. Lamberty's statements as such. It is difficult to determine from Dr. Lamberty's statements why he believed that Plaintiff would be unable to be consistently engaged in "menial kinds of jobs" and be "appropriate" in those settings. Dr. Lamberty began his sentence with, "Whether or not the patient is able to do more menial kinds of jobs is more a function of the patient's

basic level of adjustment . . ."  This is not a definitive statement that Plaintiff cannot perform "menial" jobs.  Dr. Lamberty then says, "[t]he nature of the tasks involved in doing the kind of work that he has more recently (stockroom) is not the problem . . ."  This certainly implies that Plaintiff can perform certain simple tasks.  But Dr. Lamberty goes on to state that the problem is Plaintiff remaining "consistently engaged" and "appropriate" in such work.  One interpretation of this statement is that Plaintiff is simply bored by such work, having done a higher level of intellectual work before his stroke.  There is evidence to support such an interpretation.  Plaintiff reported to Dr. Karayusuf that he found his work boring and was easily distracted.  (Tr. 267.)  Also, while he was looking for a part-time job, he told Dr. Lofness he wanted to find physical work that was "nonrepetitive, very structured, and fun."  (Tr. 358.)  Plaintiff spent a lot of time looking for work, and it is not clear from the record why Plaintiff thought he could do such work part-time but not full-time, as his doctors had not restricted his physical activity.

Dr. Lamberty also stated that, "[i]t does not appear, given the patient's history" that there was a "reasonable expectation" that Plaintiff could perform "menial type jobs" in full-time competitive employment.  The "history" Dr. Lamberty refers to could simply mean Plaintiff's recent employment history, in other words, Plaintiff had not held a menial job for long.  When Plaintiff was asked at the administrative hearing why he believed he could not work full-time, Plaintiff testified, "I have tried before and nothing ever works out.  You know, I'll work for a little bit and then there will be some performance issues and I usually

get fired or let go . . ." (Tr. 25.) However, the record indicates that Plaintiff worked in a stock room for a year before his alleged onset date, and he was not fired; he was laid off when the store closed. (Tr. 332.) The record also indicates that Plaintiff lost one job for violating company policy – allowing someone to use his employee discount. (Tr. 359.) In fact, there is no evidence in the record indicating that Plaintiff lost a "menial" job because he was unable to consistently perform the tasks required.

As Defendant suggests, Dr. Lamberty's statements could also be referring to Plaintiff's history of depression as the reason Plaintiff could not be consistently engaged in or appropriate in a job doing "menial" tasks. There is evidence in the record that Plaintiff was distressed that he could no longer perform higher-level work in the health-care setting, as he had done for many years before his stroke. (Tr. 332.) However, the evidence in the record does not support such severe depression as to render Plaintiff unable to "consistently be engaged" and "appropriate" in full-time employment.

As the ALJ noted, Plaintiff's depression resulted in only mild to moderate functional limitations, and with counseling and medication, Plaintiff's depression improved within a few months. (Tr. 14.) This conclusion is supported by Dr. Karayusuf's finding of mild depression in 2006 (Tr. 269), and Plaintiff's short period of severe depression in 2008, which improved when he obtained part-time employment. (Tr. 341-42, 347-59.)

Finally, the evidence does not support Plaintiff's contention that Dr. Lamberty's statements mean that Plaintiff's cognitive deficits, including memory, concentration, attention, and persistence and pace, prevent him from being "consistently engaged" and appropriate in "menial jobs."  All objective neuropsychological testing indicated that Plaintiff was of average to above average intelligence, but his lowest scores indicated mild to moderate impairment in visual tasks and speed of processing.  (Tr. 328, 337-39.)  Additionally, the results of Plaintiff's neuropsychological report in 1999 indicated that Plaintiff could return to his job as an emergency-room technician, and he did so until he went to work for Snyder's Drug Stores sometime in the year 2000.  (Tr. 120-21.)  Plaintiff also had significant earnings from North Country Pharmaceuticals and PJT Acquisition Corp. in the years 2003 and 2004.  (Tr. 121-22.)  Consistent with his heart problems and treatment, Plaintiff's earnings dropped in 2005, but improved in 2006.  (Tr. 121-22.)  In summary, Plaintiff's employment history is not consistent with someone whose cognitive deficits prevented him from being consistently engaged and appropriate in employment due to a stroke that occurred in 1995 or 1998.

For the reasons described above, substantial evidence in the record supports the ALJ's decision to grant greater weight to the RFC opinions of the medical expert, Dr. Horozaniecki, and the consulting state agency psychologist, Dr. D.L. Biscardi.

**C.      Analysis of Work Record in Determining Credibility**

In Plaintiff's Reply Brief, he alleges that the ALJ erred in finding him not credible based on his work history.  The record as a whole indicates that Plaintiff was employed at least part-time after the diagnosis of his heart condition and his stroke.  While that might indicate motivation to work, Plaintiff's work history is not otherwise consistent with his allegation that cognitive deficits from his stroke precluded him from working full-time.  After Plaintiff's stroke in 1995, he worked at Park Nicollet Health Services, making $19,433 in 1996, $26,848 in 1997, $24,988 in 1998, and $26,361 in 1999, and he worked three different jobs in 2000 making approximately $13,000.  (Tr. 120-21.)  This is inconsistent with a person who has cognitive deficits from a stroke in 1995 that preclude competitive employment.  As the ALJ noted, there is nothing in the record to suggest that Plaintiff attempted to find full-time employment after he applied for disability. (Tr. 14.)  In April 2008, Dr. Sethna strongly encouraged Plaintiff to undergo an occupational assessment, and there is no evidence in the record that he did so. (Tr. 342.)

Furthermore, Plaintiff's last employment, albeit part-time, ended because the store closed, not because Plaintiff could no longer perform the job.  (Tr. 332.) "It is 'relevant to credibility when a claimant leaves work for reasons other than [his] medical condition.'"  *Medhaug v. Astrue*, 578 F.3d 805, 816-17 (2009) (citing *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (citation omitted)).  Therefore, evidence in the record supports the ALJ's finding that Plaintiff's failure to seek

vocational rehabilitation or full-time employment is a negative credibility factor,

and the ALJ's decision should be affirmed.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 9 ), be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 11), be

**GRANTED**; and

3.      The case be **DISMISSED WITH PREJUDICE**, and judgment be

entered.


Date:  October 7, 2010          __*s/ Jeffrey J. Keyes*_____
                                JEFFREY J. KEYES
                                United States Magistrate Judge


Under D.Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**October 21, 2010**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  A judge shall
make a de novo determination of those portions to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable to the Court of Appeals.